Vito **TUFARIELLO**, Plaintiff–Appellant,

v.

**LONG ISLAND RAIL ROAD COMPANY**, Defendant–Appellee.

**Docket No. 05–1945–CV.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 13, 2006.

Decided: July 20, 2006.

Philip Patrick Vogt, Altier & Vogt, LLC, New York, NY, for Plaintiff–Appellant.

Sean Patrick Constable, Long Island Rail Road Co. Law Department, Jamaica, NY, for Defendant–Appellee.

Before CABRANES and SACK, Circuit Judges, and AMON, District Judge.*

SACK, Circuit Judge.

The plaintiff, Vito Tufariello, was until his retirement in 2003, employed by the Long Island Rail Road Company (the "LIRR") as a mechanic in one of its rail yards. Locomotives would sound their horns whenever they entered or exited the railroad station adjacent to this yard. In 1998 and 1999, the LIRR introduced new locomotives into service. In June and July 1999, it modified the new locomotives' horns in response to complaints that they were too loud and too shrill.

In 2003, Tufariello brought this action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, alleging that the repeated sounding of the horns had caused him permanent hearing loss and that the LIRR had negligently exposed him to those sounds at his workplace. The district court granted summary judgment in favor of the LIRR, concluding that Tufariello's FELA action was "preempted" by the Federal Railroad Safety Act of 1970 ("FRSA"), 45 U.S.C. § 421 *et seq.* (repealed in 1994 and reinstated in substance in 49 U.S.C. § 20101 *et seq.*). The court further concluded that even if this claim were not preempted, Tufariello could not make out a prima facie case of negligence because he did not offer expert testimony or objective measurements of the horns' decibel levels necessary to establish either that the train horns caused his hearing loss or that the

---

* The Honorable Carol B. Amon, of the United States District Court for the Eastern District of New York, sitting by designation.

LIRR breached its duty of care to him. We disagree with both conclusions and therefore vacate the judgment of the district court. We remand the matter to that court.

## BACKGROUND

"In setting forth the facts underlying this appeal from the district court's grant of summary judgment to the defendant[ ], we construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in [the plaintiff's] favor." *Colavito v. N.Y. Organ Donor Network, Inc.,* 438 F.3d 214, 217 (2d Cir.2006).

### The Train Horns

Tufariello worked for the LIRR from 1978 until 2003 as a "B and B mechanic." In that capacity, he installed and replaced windows, painted doors, fixed shingles on roofs, and installed tile and linoleum. In 1998 and 1999, Tufariello was assigned to the LIRR's Patchogue Yard, where he built parts for a bridge project.[1] At that time, the LIRR placed into service its new diesel-electric ("DE") and dual-mode ("DM")[2] locomotives, which were equipped with warning horns that were sounded as the locomotives entered and exited Patchogue station.

According to Tufariello, these horns were so loud that "a person's speech could not be heard by another person within one arm's length when spoken at normal levels in the Yard." Plaintiff's 56.1 Statement ¶ 34. He also asserts that each time a horn would sound, "it caused physical discomfort and my ears would continue to ring after the horn stopped." Aff. of Vito Tufariello, Feb. 15, 2005, at ¶ 16. Tufariello contends that he asked the LIRR's building and bridge supervisor, Keith McFarland, for hearing protection three or four times but was never provided with it.

Tufariello was not the only person employed at the yard who complained about the horns. McFarland testified that "everyone" in the yard did. Dep. of Keith Mc[F]arland, Dec. 7, 2004, at 15 ("McFarland Dep.").[3] He also stated that upon hearing the blasts, "[y]ou would have to put your hands over your ears ... [b]ecause it was incredibly loud." *Id.* at 25. Somewhere between six and twelve locomotives would sound their horns each day, with each blast lasting about ten to fifteen seconds.

Community residents and local political representatives also complained to the LIRR about the loudness and shrillness of the horns. In response, the LIRR agreed to test them in order to ensure their compliance with federal standards. The LIRR conducted such tests in May and June 1999 at its Richmond Hill and Morris Park Yards, but it conducted no such tests at Patchogue Yard. The tests showed that when measured 100 feet in front of the locomotive on the track, the horns' sounds were, at their loudest, a time-weighted average of 100 dB(A).[4] When the same

1. Patchogue Yard is west of, and adjacent to, the LIRR's Patchogue train station.

2. Dual-mode locomotives are able to run either on diesel-electric power or electric power from an external source, such as a third rail.

3. The deposition's reference to "McParland" appears to be a typographical error.

4. The standard unit of measurement of sound is the decibel ("dB"). Because the human ear is not equally sensitive to all frequencies, with some frequencies judged to be louder for a given signal than others, the most common method of frequency weighting is the A-weighted noise curve ("dBA"). The A-weighted decibel scale discriminates between frequencies in a manner approximating the sensitivity of the human ear. In the A-weighted decibel scale, everyday sounds normally range from 30 dBA (very quiet) to 100 dBA (very loud).

*Grand Canyon Trust v. FAA,* 290 F.3d 339, 343 n. 2 (D.C.Cir.2002).

horns were measured from 30 feet at a 90 degree angle from the track, the loudest level recorded was 110 dB(A).

As a result of the tests, the LIRR decided to reduce the frequency (or pitch) of the horns and to reposition them on the locomotives. After the modifications, the horns recorded a decibel level of 108 dB(A) when measured 100 feet in front of the locomotive on the track. They recorded a decibel level of 111 dB(A) when measured from 30 feet at a 90 degree perpendicular angle from the track.

Throughout this time, the LIRR was conducting a "Hearing Conservation Program" pursuant to regulations promulgated by the Occupational Safety & Health Administration ("OSHA"). *See* 29 C.F.R. § 1910.95(c). Under this program, hearing protection was made available to all LIRR employees who were exposed to an eight-hour time-weighted average sound level ("TWA") of 85 dB(A) or greater. The LIRR asserts that it further ensured that such hearing protection was worn by any employee exposed to a TWA of 90 dB(A) or greater. Tufariello testified, however, that he was never provided with any such protection. Dep. of Tufariello, May 4, 2004, at 20. McFarland testified that he discouraged the workmen from wearing hearing protection "for safety reasons," lest it prevent them from hearing vehicles and equipment in the yard. McFarland Dep. at 16. It was, however, never established what decibel level of sound Tufariello was exposed to while working in the yard.

According to Tufariello, in September 2000, he began to notice that he was having trouble hearing. An examining physician, Dr. Eliot Danziger, told Tufariello that he had suffered permanent hearing loss and referred him to another doctor, who provided Tufariello with a hearing aid. Dr. Danziger later averred that based on his audiological testing, Tufariello suffered from a "severe sensorial impairment bilaterally." Aff. of Dr. Eliot Danziger, Feb. 16, 2005, at ¶ 5. He further stated that it was his opinion "with a reasonable degree of medical certainty" that the injury to Tufariello's ears "was caused by exposure to 10–12 train horn blasts per day in the Patchogue Yard in late 1998 and 1999." *Id.* at ¶ 19.

*The District Court Opinion*

On July 18, 2003, Tufariello filed a complaint in the United States District Court for the Eastern District of New York. He alleges that the LIRR was negligent for, among other things, "failing to provide proper hearing protection to [him] in light of his exposure to excessive noise" and for not providing him with "reasonably safe conditions in which to work, and reasonably safe tools and equipment." Compl. at 2–3. Such negligence, he asserts, caused him permanent hearing loss for which the LIRR was liable under FELA. On January 24, 2005, the LIRR filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

The district court (Cheryl L. Pollak, *Magistrate Judge*)[5] granted the LIRR's motion. It first concluded that Tufariello's claims were "preempted" by the FRSA. *Tufariello v. Long Island R.R. Co.,* 364 F.Supp.2d 252, 256 (E.D.N.Y.2005). The court recognized that the preemption provision of the FRSA, 49 U.S.C. § 20106, affects only the propriety of applying provisions of state law, but it reasoned that the FRSA's goal of uniformity in the law relating to railway safety required that it also trump FELA insofar as the two federal statutes conflict. *Id.* at 257–61. Be-

**5.** The parties consented to having Magistrate Judge Pollack conduct all proceedings in this case, including the entry of final judgment, in accordance with 28 U.S.C. § 636(c).

cause regulations promulgated pursuant to the FRSA provide for a minimum decibel level for train warning-devices, the court concluded, such a regulation " 'cover[ed]' the subject matter" of warning devices, thereby precluding Tufariello's cause of action under FELA. *Id.* at 259–60.

The district court then concluded that even if Tufariello's claims were not precluded by the FRSA, he had still failed to make out a prima facie case of negligence. Without expert testimony, Tufariello could not establish that the horn blasts caused his injury, and without objective evidence of the decibel level of the horns, Tufariello could establish neither causation nor that the LIRR breached its duty to maintain a safe workplace. *Id.* at 261–62.

Tufariello appeals.

## DISCUSSION

### I. Standard of Review

Summary judgment cannot be granted unless there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A moving party is entitled to a judgment as a matter of law when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review *de novo* a district court's decision to grant a motion for summary judgment. As noted earlier, "we construe the evidence in the light most favorable to the plaintiff, drawing all reasonable inferences and resolving all ambiguities in his favor." *Colavito,* 438 F.3d at 217.

### II. Preserved Claims

Tufariello has advanced three bases for recovery, only one of which has been properly preserved for our review. First, in the district court, Tufariello argued that the LIRR was negligent either because the sound of the locomotive horns was too loud or because the LIRR had failed to offer him sound protection for his ears. But he now contends that he is "not claiming defendant was liable to him because its new locomotives had a loud horn blast," effectively waiving the first part of that claim. Appellant's Br. at 9.

Second, Tufariello asserts for the first time before us that the LIRR was negligent for having "plac[ed] its worksite in such close proximity to the location where the new diesel-electric locomotive passed[,] thus exposing him to the extremely loud horn blasts." *Id.* Because "[t]he law is well established that a federal appellate court will generally not consider an issue or argument not raised in the district court," *In re Enron Corp.,* 419 F.3d 115, 126 (2d Cir.2005) (internal quotation marks, citation and brackets omitted), Tufariello may not now assert a new theory based on the location of the rail yard.

Throughout the litigation, however, Tufariello has maintained a third argument: that the LIRR was negligent in failing to provide him with hearing protection. *See* Compl. at 3; Tufariello Mem. of Law in Opp'n to Mot. for Summ. J., Feb. 18, 2005, at 2; Appellant's Br. at 9. He has thus asserted that theory of negligence in the district court and preserved it on appeal.

### III. "Preemption"

■ FELA provides that any railroad engaging in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. The district court concluded that FELA was "preempted" by the FRSA. *Tufariello,* 364 F.Supp.2d at 256–

61. But the preemption doctrine flows from the Constitution's Supremacy Clause, U.S. Const., Art. VI, cl. 2, which "invalidates state laws that interfere with, or are contrary to, federal law." *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 414–15 (2d Cir.2002) (internal quotation marks and citation omitted). The doctrine is inapplicable to a potential conflict between two federal statutes.

Courts have concluded, however, that the FRSA may, in certain circumstances, preclude a cause of action under FELA. Several courts have decided, for example, that the FRSA precludes an action under FELA where a railroad employee claims that he or she was injured because of a negligently excessive train speed, and where the train was not exceeding the speed limit set by FRSA regulations. These courts have reasoned that permitting such FELA claims would be contrary to "Congress' intent [in passing the FRSA] that railroad safety regulations be nationally uniform to the extent practicable." *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 443 (5th Cir.2001); *see also Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 776 (7th Cir.2000); *Rice v. Cincinnati, New Orleans & Pac. Ry. Co.*, 955 F.Supp. 739, 740–41 (E.D.Ky.1997); *Thirkill v. J.B. Hunt Transp., Inc.*, 950 F.Supp. 1105, 1107 (N.D.Ala.1996). *But see Earwood v. Norfolk S. Ry. Co.*, 845 F.Supp. 880, 891 (N.D.Ga.1993) (concluding that a FELA action based on excessive speed was *not* precluded by the FRSA). The district court relied on this line of cases in concluding that 49 C.F.R. § 229.129, which establishes minimum sound levels for warning devices on trains, " 'substantially subsume[s]' " the subject matter of the decibel level of horns and thus precludes Tufariello's FELA action. *Tufariello*, 364 F.Supp.2d at 260 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)).[6]

■ The FRSA regulations here, though, do not address the circumstances under which railroad employees must be provided hearing protection.[7] Thus, irrespective of whether, in order to establish uniform national standards as to minimum train horn volumes, the FRSA precludes a negligence action brought under FELA based on excessive volume of the locomotive horns—something we need not and do not decide—the FRSA does not preclude a suit based on the alleged failure to equip an employee with hearing protection. We think that the district court was therefore mistaken in concluding that the FRSA precludes Tufariello's cause of action based on the LIRR's failure to provide him with safety equipment, the only claim that remains before us on appeal.

## IV. Prima Facie Case of Negligence

■ FELA provides, as noted, that any railroad engaging in interstate commerce "shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce … for such injury or death resulting in whole or in part from the negligence of

---

**6.** The district court recognized that proposed amendments to 49 C.F.R. § 229.129, which have since come into force, also set a maximum level for audible warning signals, *Tufariello*, 364 F.Supp.2d at 259 n. 9, but at the time relevant here, the provision did not contain a prescribed maximum level.

**7.** Nor does OSHA preclude such a claim. *See* 29 U.S.C. § 653(b)(4) ("Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.").

any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation. *See Sinclair v. Long Island R.R. Co.*, 985 F.2d 74, 77 (2d Cir.1993) (citing *Robert v. Consol. Rail Corp.*, 832 F.2d 3, 9 (1st Cir.1987)). At the same time, the plaintiff's burden in making a showing of causation and negligence is lighter under FELA than it would be at common law because "the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues." *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 438–39, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). Thus, under FELA, an employer has "a duty to provide its employees with a safe workplace," which it has breached "if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Ulfik v. Metro–North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir.1996). Accordingly, we have observed that "an employer may be held liable under FELA for risks that would otherwise be too remote to support liability at common law." *Id.*

The district court appears to have concluded that Tufariello failed to make out a prima facie case of negligence because (1) he did not provide expert testimony as to whether his exposure to the horn blasts caused his hearing loss,[8] and (2) he did not offer an objective measurement of the horns' decibel level, which the court deemed necessary to show both causation

and a breach of the LIRR's duty of care to Tufariello. *See Tufariello*, 364 F.Supp.2d at 261–62.

## A. Expert Testimony and Causation

■ To establish causation in a common law negligence action, a plaintiff generally must show that the defendant's conduct was a "substantial factor in bringing about the harm." Restatement 2d of Torts § 431(a); *cf. Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 170 (1980) ("To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury."). Under the federal common law of FELA actions, *see Morant v. Long Island R.R. Co.*, 66 F.3d 518, 522 (2d Cir.1995), though, the plaintiff carries a lighter burden. *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999) ("The Supreme Court has said, based on the explicit language of the statute, that with respect to causation, a relaxed standard applies in FELA cases."). Thus, "the test of a jury case" in a FELA action "is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

■ The LIRR argues that the question of whether Tufariello's exposure to the sound of train horns caused his hearing loss is a "technical issue[ ]" that requires

---

8. Tufariello did offer expert testimony in the form of Dr. Danziger's affidavit, which the LIRR moved to have excluded as insufficiently reliable under Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). But the district court never ruled on that motion and

relied on Dr. Danziger's affidavit in its opinion. *Tufariello*, 364 F.Supp.2d at 261–62. Thus, although we assume below that Dr. Danziger's testimony is admissible, *see infra* Part IV.B.1, we address the issue of whether expert testimony is required in the event that, on remand, the court concludes otherwise.

expert testimony. Appellee's Br. at 10. *See* Fed.R.Evid. 701 (prohibiting non-expert witnesses from offering opinions or making inferences "based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). We disagree. We think that our decision in *Ulfik, supra,* is controlling on this point.

In *Ulfik,* the plaintiff was an employee of the Metro–North Railroad. While working at Grand Central Station, in New York City, Ulfik fell down a flight of stairs as a result of dizziness allegedly caused by his having inhaled paint and solvent fumes in the railroad tunnels a few days earlier. He brought an action for negligence under FELA. In reversing the district court's grant of judgment as a matter of law in favor of the defendant at the close of the plaintiff's case-in-chief, we concluded that "the trier of fact could reasonably determine, without expert testimony, that prolonged exposure to paint fumes would cause headache, nausea, and dizziness." *Ulfik,* 77 F.3d at 59–60.

The evidence Tufariello proffered to the district court here is analogous. Here, as in *Ulfik,* there is a generally understood causal connection between physical phenomena—in this case, very loud sounds, which we refer to colloquially as "deafening" [9]—and the alleged injury that "would be obvious to laymen." *Simpson v. Northeast Ill. Reg'l Commuter R.R. Corp.,* 957 F.Supp. 136, 138 (N.D.Ill.1997). And here, as there, "the right of the jury to decide the issue of causation must be most liberally viewed." *Marchica v. Long Island R.R. Co.,* 31 F.3d 1197, 1207 (2d Cir.1994) (internal quotation marks and citation omitted).[10] We therefore think that Tufariello's claim—like Ulfik's—may be decided by a factfinder even in the absence of expert testimony.

In contending otherwise, the LIRR relies on two toxic tort cases. In *Wills v. Amerada Hess Corp.,* 379 F.3d 32 (2d Cir. 2004), we agreed with the district court's exclusion of the plaintiff's expert testimony because it failed to include scientific evidence that could prove the necessary "link between benzene exposure and squamous cell carcinoma." *Id.* at 37. Similarly, in *Simpson, supra,* the district court granted

---

**9.** *See, e.g., British Airways Bd. v. Port Auth. of N.Y. and N.J.,* 564 F.2d 1002, 1013 (2d Cir. 1977) (Mansfield, J., concurring in part) ("The [Concorde] may not be synonymous with progress if the price is to be increasing noise pollution and vibration of deafening proportions for thousands."). Indeed, so well-accepted is the notion that loud sound can deafen that we have from time to time used the expression's common ironic counterpart: "The silence is deafening." *See, e.g., County of Suffolk v. First Am. Real Estate Solutions,* 261 F.3d 179, 189 (2d Cir.2001); *Samuels v. Mockry,* 142 F.3d 134, 137 (2d Cir.1998) (quoting statement by magistrate judge); *Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n,* 582 F.2d 166, 171 (2d Cir.1978).

**10.** The LIRR further argues that even if it is common knowledge that exposure to extremely loud noise may cause hearing loss, the precise decibel level necessary to cause

hearing loss is not known by the average person. In support of this proposition, it cites *Turner v. Norfolk & Western Railway Co.,* 785 S.W.2d 569 (Mo.Ct.App.1990), in which the court noted that "[w]hile it may be said that it is a matter of common knowledge that loud noise may be harmful to hearing, it cannot be said that the dB(A) level which may cause injury to hearing is commonly known." *Id.* at 572. But the *Turner* court made this finding in support of its conclusion that the plaintiff had failed to prove constructive knowledge on the part of the defendant. That is, it referred to "common knowledge" not to determine whether expert testimony was required to establish factual causation, but rather to determine whether the injury was sufficiently foreseeable to hold the defendant liable for plaintiff's injury. In any event, we are not persuaded that the plaintiff must establish the precise decibel level in order to create a triable issue of fact as to liability for hearing loss. *See* Part B, *infra.*

summary judgment to the defendant because the plaintiff had failed to offer expert testimony to establish that his exposure to particular chemicals was the cause of his migraine headaches. *Simpson,* 957 F.Supp. at 137–38. The court noted that "[e]xpert testimony usually is necessary to establish a causal connection between an injury and its source unless the connection is a kind that would be obvious to laymen, such as a broken leg from being struck by an automobile." *Id.* at 138 (internal quotation marks and citation omitted).

The causal link Tufariello seeks to establish between hearing loss and repeated exposure to noise so loud that it causes physical pain or ear-ringing is, as we have noted, widely known and, so far as we are aware, not the subject of scientific dispute.[11] It is, indeed, not so very far from the connection between "a broken leg" and "being struck by an automobile," the example used by the *Simpson* court as an instance in which expert testimony is unnecessary. *Id.* (citation and internal quotation marks omitted). Toxic contamination cases such as *Wills* and *Simpson,* in which genuine doubt exists as to whether

exposure to any amount of a particular chemical could cause the plaintiff's injury, are therefore unhelpful to the LIRR.[12]

### B. Objective Measurements of Decibel Levels

The district court also found fatal to Tufariello's case his failure to provide objective measurements of the decibel levels to which he had been exposed. The court did not make entirely clear whether it thought that such measurements were necessary to establish causation or breach of duty, but in neither case does the law support the court's conclusion.

■ *1. Causation.* The district court noted that Tufariello "has presented no objective measurements of the sound levels that he experienced" and instead "relies on the subjective opinions of plaintiff and others that the horns were 'very, very loud,' and his expert's opinion that 'the connection between excessively loud noise and hearing loss has been medically accepted as fact for more than 200 years.'" *Tufariello,* 364 F.Supp.2d at 262 (citation omitted) (quoting Pl.'s Mem. of Law at 1, 7). The court concluded that such evi-

---

**11.** Tufariello submitted materials from the National Institute for Occupational Safety and Health, for instance, which state that "if you have to raise your voice to talk to someone who is an arm's length away, then the noise is likely to be hazardous" and that "if your ears are ringing or sounds seem dull or flat after leaving a noisy place, then you probably were expose[d] to hazardous noise." Decl. of Philip P. Vogt for Pl. in Opp. to Def.'s Mot., Feb. 18, 2005, Exhibit G.

**12.** There is one case of which we are aware, *Bowles v. CSX Transp., Inc.,* 206 Ga.App. 6, 424 S.E.2d 313 (1992), in which a court concluded, on facts similar to those of the case at bar, that the plaintiff's claim for hearing loss failed as a matter of law because of an absence of medical evidence. The court found the result warranted in light of the requirement under Georgia law that expert testimony be presented if there is a "medical question,"

and the fact that the claim was "based entirely on [the plaintiff's] testimony that he was exposed to noise from engines and horns from which we are being asked to extrapolate a causal link." *Id.* at 7, 424 S.E.2d at 315. But the court also noted that in the case before it, the plaintiff had "offered no evidence of any defect in [the defendant's] equipment, or any violation of ... FELA, nor ha[d] he alleged that his injury was the result of any negligence of [the defendant] with regard to that equipment." *Id.* at 7–8, 424 S.E.2d at 315. That fact alone would be enough to distinguish the *Bowles* case from this one, even if the court's causation analysis were clearly spelled out and persuasive. There was no reason for the court to elaborate on the reasons for its conclusion, however, since it went on to point out that there, the "hearing loss claim [was] barred by a three-year statute of limitation, in any event." *Id.* at 8, 424 S.E.2d at 315.

dence was insufficient as a matter of law. *Id.* We do not think that the plaintiff must produce "objective measurements of the sound levels," *id.*, to carry his burden under FELA of showing that the LIRR's alleged negligence "played any part, even the slightest," in causing plaintiff's hearing loss, *Rogers,* 352 U.S. at 506, 77 S.Ct. 443.

█ Federal Rule of Evidence 701 permits non-expert witnesses to offer opinions and to draw inferences so long as they are "limited to those opinions or inferences which are . . . rationally based on the perception of the witness." A witness's testimony as to the pain he or she experienced is admissible under Rule 701 to show the cause and extent of such injuries if it is based on the witness's own perceptions. *See Bushman v. Halm,* 798 F.2d 651, 660 (3d Cir.1986) (ruling admissible under Rule 701 a plaintiff's testimony "that he experienced recurrent pain in his knees and surrounding soft tissues after they contacted his truck's dashboard during the accident"). Tufariello testified that he experienced pain upon hearing the train blasts and that they made his ears ring. McFarland also said that the horn blasts were so loud that "[y]ou would have to put your hands over your ears." McFarland Dep. at 25. Such testimony is based on the perception of the witnesses and is therefore admissible under Rule 701.

Tufariello then offered expert evidence to show the causal connection between such pain-causing noise and hearing loss. Dr. Danziger attested to the fact that "[n]oise which is perceived as painful or causes the recipient's ears to ring or sounds to seem dull after the noise ends" or that is "loud enough to prevent a person from being heard without raising one's voice by another person who is one arm's length away is considered hazardous."

Danziger Aff. at ¶¶ 12, 13. Assuming that Dr. Danziger is qualified to give such an expert opinion, *see supra* n. 8, a reasonable juror could conclude, under the relaxed showing of causation permitted by FELA and based on all the testimony presented, that it is more likely than not that the LIRR's "negligence [in failing to give Tufariello protective equipment] played any part, even the slightest, in producing the injury" of which Tufariello complains, *see Rogers,* 352 U.S. at 506–07, 77 S.Ct. 443. A demonstration of the exact decibel level to which Tufariello was subjected—proof that might be exceptionally difficult to obtain in light of the LIRR's decision to alter the horns subsequent to the time Tufariello allegedly suffered his injury—is thus not necessary for Tufariello to make a showing on the issue of causation.[13]

*2. Breach of Duty of Care.* According to the district court, "[t]he problem is that in the absence of any evidence as to the noise levels actually experienced by Mr. Tufariello, it is impossible for anyone to say that the railroad was negligent." *Tufariello,* 364 F.Supp.2d at 262. The court therefore concluded that without such objective measurements, the trier of fact would be required to accept the LIRR's assertion that the relevant sound levels were within OSHA limits and that, therefore, "the plaintiff will have a difficult, if not impossible, time establishing that the railroad was negligent." *Id.*

█ The question this case presents, however, is whether the LIRR was negligent in failing to provide safety gear to protect Tufariello's hearing in the presence of loud noises, not whether such noises conformed to OSHA regulations. Under FELA, liability attaches whenever an employer breaches the statute's high standard of care, "[a]nd this result follows

---

**13.** The lack of an objective measurement of the decibel level may perhaps be considered in evaluating the reliability of a proffered ex-

pert's testimony, *see Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786, but the district court did not address that issue.

whether the fault is a violation of a statutory duty or the more general duty of acting with care." *Kernan,* 355 U.S. at 439, 78 S.Ct. 394. Indeed, "[c]ompliance with OSHA standards ... has been held not to be a defense to state tort or criminal liability." *UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 214, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (White, J., concurring in part and concurring in the judgment); *see also Del Cid v. Beloit Corp.,* 901 F.Supp. 539, 548 n. 7 (E.D.N.Y.1995) (noting that even if the defendant's machine "complied with the New York State and OSHA regulations, compliance or lack of compliance with such regulations is not dispositive of the issue of a design defect, but is merely some evidence of such a defect"). The fact that the LIRR's Hearing Conservation Program complied with OSHA regulations regarding hearing protection therefore does not conclusively demonstrate that the LIRR was free from negligence. *See* Restatement 2d of Torts § 288C (1965) ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions."); *see also Robertson v. Burlington N. R.,* 32 F.3d 408, 410 (9th Cir.1994) (holding that a violation of OSHA standards did not constitute negligence *per se* but that such standards were admissible as "some evidence of the applicable standard of care"); *cf. Charter Oak Fire Ins. Co. v. Nat'l Wholesale Liquidators,* 279 F.Supp.2d 358, 361 n. 3 (S.D.N.Y.2003) (in a negligence action under New Jersey law where the plaintiff alleged that inadequate sprinklers failed to contain a fire, noting that "although the sprinklers were code [compliant], such compliance does not, of itself, establish due care as a matter of law").

"It is [indisputable] that [the LIRR] had a duty to provide its employees with a safe workplace." *Ulfik,* 77 F.3d at 58. The question is whether it breached that duty. Under FELA, the LIRR did so if "it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees," including Tufariello. *Id.; see also id.* n. 1 ("[N]umerous appellate courts, including ours, have construed the statute, in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation.").

Tufariello testified that while working at the Patchogue Yard he endured repeated exposure to train horns that caused him physical pain. He also offered evidence that he and others complained of the loud volume of the horns. And he testified that he specifically asked his superiors for hearing protection but was denied it. On that evidence, viewing the facts in Tufariello's favor and in light of FELA's relaxed burden, we think that a reasonable factfinder could find that the LIRR breached its duty to ensure that its workers were protected from extremely loud noises, irrespective of whether the LIRR complied with the relevant OSHA regulations. *Cf. Ulfik,* 77 F.3d at 58 (concluding that to establish negligence, a FELA plaintiff need only prove "that Metro–North could have reasonably foreseen that the paint would increase the likelihood of injury, and that Metro–North failed to take reasonable precautions"); *Broussard v. Union Pac. R.R.,* 700 So.2d 542, 548 (La.Ct.App.1997) (concluding, on facts similar to those of the case at bar, that "[a] FELA plaintiff can present his hearing loss case without reference to a specific regulation or without proving the precise decibel level of noise in the workplace").[14]

**14.** The district court and the LIRR both cite *Broussard* for the contrary proposition that "simply establishing that the work place is

noisy fails to meet the legal requirements for proving negligence." That quotation, howev-

We therefore conclude that Tufariello has adduced sufficient evidence to establish a prima facie case under FELA that the LIRR breached its duty of care to Tufariello by exposing him to hazardous noise and that such exposure caused him permanent hearing loss.

## CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court granting the defendant's motion for summary judgment, and we remand the case for further proceedings consistent with this opinion.

er, is from the *dissent* in *Broussard. See id.* at  550 (Hightower J., *dissenting* ).